# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

Newell D. Mitchell,

      **Plaintiff,**

v.                                                          **Case No. 09-2087-JWL**

West Coast Life Insurance Co. and
Protective Life Corporation,

      **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff Newell D. Mitchell filed this suit against defendants alleging that defendants terminated his employment in retaliation for his whistleblowing activities in violation of Kansas law and/or that defendant disciplined him and terminated his employment in retaliation for his engaging in protected activity under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. This matter comes before the court on defendants' motion for summary judgment on all claims (doc. 34). As will be explained, the motion is denied.

## I.      Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Defendant West Coast Life Insurance Company is a subsidiary of defendant Protective Life Corporation. Plaintiff Newell D. Mitchell began his employment with defendants in December 2000, when he was hired as a senior underwriter in defendants'

Overland Park, Kansas office.[1]  As a senior underwriter, plaintiff was responsible for reviewing applications for life insurance policies and assessing an applicant's risk and mortality.  Plaintiff reported to Lisa Palmer, one of defendants' Assistant Vice Presidents, and Ms. Palmer, in turn, reported to Marilyn Reed, defendants' Chief Underwriter.

In early 2007, plaintiff was assigned as the underwriting team leader for West Coast Life's Select Quote business.  Select Quote is an independent insurance broker defendants work with to obtain business.  Select Quote solicits customers through mailings and other advertisements, gathers information about the customer's needs and then provides a proposal to the customer regarding different insurance products offered by different companies.  If a customer is interested in applying for term life insurance with West Coast Life or Protective Life after speaking with a Select Quote agent, then the agent collects preliminary information required for the life insurance application and submits this information to defendants.  Defendants then use an internal process called "Telelife" to collect the remaining customer information needed for an application initiated by Select Quote.

Like all insurance companies, defendants are subject to the state insurance regulations in each state where they do business and those regulations vary from state to state.  Defendants have legal and compliance departments dedicated to advising and guiding their business practices and procedures in accordance with applicable laws and regulations. Defendants' Chief Compliance Officer is Steve Callaway, who reports directly to Debbie Long, Protective's

---

[1]Plaintiff was hired by Empire General, a subsidiary of Protective Life Corporation. In 2006, Empire General merged into West Coast Life Insurance Company.

2

General Counsel.  As Chief Compliance Officer, Mr. Callaway is responsible for overseeing the compliance and ethics component of defendants' business, including defendants' Code of Business Conduct and certain aspects of federal and state regulatory compliance.

Defendants' written Code of Business Conduct requires any employee who identifies a legal or compliance concern to report it to defendants so that it may be further investigated and addressed by the appropriate legal and compliance personnel.  The Code of Business Conduct provides numerous avenues for an employee to report a legal or compliance concern, including the provision of a hotline, an email address and the phone numbers for Ms. Long and Scott Adams, defendants' Chief Human Resources Officer.  During plaintiff's employment, the Code of Business Conduct provided that "No employee will suffer any adverse action, retribution or career disadvantage for questioning a Company practice or making a good faith complaint or report of a suspected violation of this Code or other irregularity."

Shortly after becoming team leader of the Select Quote business, plaintiff became concerned that defendants were not in compliance with certain replacement regulations in certain states.  Although plaintiff had several concerns about defendants' noncompliance, his primary concern was that defendants' Telelife process was not complying with the "replacement regulations" for those states that had adopted the newest version of the model regulations issued by the National Association of Insurance Commissioners (NAIC) which required that if the replacing insurer (*i.e.*, an insurer issuing a policy to replace an existing policy) and the original insurer were under common ownership, then the replacing insurer must give the policyholder or beneficiary credit for the time elapsed under the original policy's contestability and suicide

period.[2]

During July and August 2007, plaintiff voiced his concerns about defendants' noncompliance with state replacement regulations to several supervisors, including Lisa Palmer and Marilyn Reed. Ms. Reed informed plaintiff that she would forward his concerns to defendants' legal department and that she would have Gary Carroll, the compliance officer for defendants' Life and Annuities Division, contact plaintiff to discuss his concerns. In early September 2007, Mr. Carroll called plaintiff to discuss plaintiff's belief that defendants were not complying with certain states' replacement regulations, including his belief that defendants were not complying with a unique replacement regulation in Kentucky that required that all replacement policies, regardless of whether the original and replacing insurers were under common ownership, credit the insured any elapsed time under the contestability and suicide provisions of the original policy. Mr. Carroll testified that he found plaintiff's behavior during the phone call very odd in that plaintiff's outrage was disproportionate to the issues being discussed. Nonetheless, Mr. Carroll confirmed that he would look into plaintiff's concerns and he began to research the issues.

With regard to plaintiff's concerns about Kentucky's regulations, Mr. Carroll ultimately confirmed that plaintiff was correct and that Kentucky replacement regulations required that

---

[2]The contestability period is the period of time during which the insurer could challenge a claim based on suicide or misrepresentation and request additional information before deciding to pay or deny a claim.

replacement policies include an endorsement stating that the contestability period for the full amount of the original policy would run from the effective date of the original policy. Mr. Carroll's compliance department also identified that Kansas had a similar regulation and determined that West Coast Life's process for issuing replacement policies did not comply with the Kentucky and Kansas replacement requirements. Defendants began remediation efforts with respect to this issue. As will be seen, however, plaintiff was not satisfied with the speed, effectiveness or thoroughness of defendants' remedial efforts.

With respect to plaintiff's concerns about state replacement regulations regarding internal replacements (*i.e.*, policies replaced by the same company or one of its affililates), Mr. Carroll's compliance department determined that although those regulations did not require a specific endorsement regarding the adjustability of the contestability provision, it was nonetheless a "best practice" to do so. Accordingly, defendants began the process of drafting endorsements and filing them for approval by the insurance departments in the pertinent states so that endorsements could be mailed to affected policyholders. Moreover, defendants began the process of auditing its contestable death claims dating back to March 1994 for each state that had adopted the pertinent replacement regulations. Again, as will be seen, plaintiff criticized defendants for what he perceived to be a slow response to his concerns.

Just days after speaking with Mr. Carroll, plaintiff sent Mr. Carroll an e-mail asking for an "update" on the issues plaintiff had raised. Mr. Carroll advised plaintiff that he was busy working on West Coast Life's assessment for the Insurance Market Standards Association (IMSA), an insurance trade organization that develops ethical marketplace standards for the

industry, but would turn to plaintiff's concerns thereafter. Plaintiff, in turn, questioned Mr. Carroll as to how he could "sign off" on the IMSA assessment knowing that defendants were not compliant with state replacement regulations. Mr. Carroll explained that plaintiff's concerns were not pertinent to the assessment; rather, the assessment focused on whether defendants had processes in place to identify deficiencies in company processes to allow for continuous improvement.

Apparently dissatisfied with this response, plaintiff contacted Ms. Long, defendants' General Counsel, the following day. Plaintiff advised Ms. Long that he believed that Mr. Carroll had not given plaintiff's concerns a "high priority" and expressed his inability to reconcile the IMSA assessment with defendants' failure to comply with state replacement regulations. Ms. Long, in turn, contacted Mr. Callaway, defendants' Chief Compliance Officer, and asked him to investigate both the merits of plaintiff's concerns about the replacement regulations as well as plaintiff's contention that Mr. Carroll and his team were not appropriately addressing those concerns. As part of his investigation, Mr. Callaway interviewed plaintiff and Mr. Carroll. Mr. Callaway concluded that Mr. Carroll and his team were taking appropriate corrective action with regard to the replacement issues and concluded that defendants were not required to raise these issues with the IMSA assessor.

During the month of October, plaintiff was in frequent contact via email with Mr. Callaway concerning defendants' compliance with the replacement regulations. In these communications, plaintiff repeatedly questioned defendants' commitment to their Code of Ethics and to the IMSA principles. He repeatedly asked Mr. Callaway to give him a firm date on when

defendants could be expected to be in full compliance with all relevant replacement regulations. He advised Mr. Callaway that "having to underwrite and issue policies in violation of the state regulations is stressful and unacceptable." Mr. Callaway, in turn, provided plaintiff with various updates on defendants' efforts to issue replacement policies consistent with the replacement regulations and other remedial action taken and planned by defendants.

In early November 2007, plaintiff raised a new issue concerning a Nebraska replacement regulation and he advised Ms. Palmer and Ms. Reed that he believed, based on his interpretation of the regulation, that defendants' Telelife business failed to comply with the Nebraska regulation. Although she forwarded plaintiff's concern to defendants' compliance personnel, Ms. Reed also cautioned plaintiff that he was spending too much time "scrutinizing" defendants' compliance with regulations. Plaintiff responded that Ms. Reed did not need to worry about him doing his share of the work and that there were other "more pressing problems" that needed her attention. Throughout November, plaintiff continued to initiate communications with numerous individuals about defendants' compliance with state replacement regulations and providing his opinions on appropriate corrective action. At one point, plaintiff, in an email to Mr. Callaway, accused the company of "willful noncompliance." Defendants again updated plaintiff on the status of their investigation and their remedial efforts.

On November 20, 2007, Mr. Callaway called plaintiff, thanked him for having reported his concerns but advised him that it was unnecessary and inappropriate for him to continue to repeatedly raise the same concerns with multiple individuals. In an email memorializing their phone conversation, Mr. Callaway again thanked plaintiff for reporting his compliance concern

but cautioned plaintiff as follows:

> We appreciate your cooperation with compliance personnel and the legal department, but you need not and should not further involve yourself in the review, analysis or any remediation efforts unless you are asked to do so. Others in our company have the responsibility for these efforts and it is best to let them do their jobs without any distractions.

Plaintiff then contacted Ms. Long about Mr. Callaway's request that plaintiff "stop his pursuit" of replacement compliance issues and suggested that he was unwilling to do so. In response, Ms. Long advised plaintiff that the matter was being handled by appropriate personnel, that he should permit those people to "do their jobs without distraction," and that if anyone needed any additional information or assistance from plaintiff, he would be contacted.

Plaintiff then contacted Mr. Callaway by email and stated his belief that it was highly probable that defendants had wrongfully denied a claim based on defendants' noncompliance and that defendants were required to review all denied contestable claims in the applicable states. The following day, plaintiff sent this email to Ms. Long:

> By what authority does Steve Callaway or you have to tell me to approve policies for issue that I know and Steve Callaway knows will not be in compliance with some NAIC replacement regulations? How does our Code of Business Conduct and the IMSA principles fit into this equation? I would like an explanation please.

That same day, plaintiff emailed Johnny Johns, defendants' President and CEO, alleging that Mr. Callaway had instructed him to approve for issue policies that are in violation of state insurance regulations.

On November 26, 2007, Mr. Callaway responded to plaintiff via email on behalf of himself, Ms. Long and Mr. Johns. In that email, Mr. Callaway reiterated that defendants were

taking corrective action to ensure compliance with the replacement regulations and advising plaintiff that defendants' efforts were proceeding at a reasonable pace. Mr. Callaway also disagreed with plaintiff's statement that anyone had asked him to issue a noncompliant policy. Mr. Callaway further emphasized that plaintiff's responsibility as an underwriter included the review and approval of the risk selection for specific applicants but did not include the approval of policy forms or the issuance of policies. Mr. Callaway again thanked plaintiff for reporting his initial concerns but again cautioned plaintiff that he had involved himself inappropriately in the work of defendants' lawyers and compliance personnel and had interfered with the investigation and remedial efforts. In closing, Mr. Callaway expressed his hope that they could "move forward attending to our respective responsibilities without further inappropriate disruption." Plaintiff responded to Mr. Callaway's email by agreeing that they could "move on." Nonetheless, on December 3, 2007, plaintiff forwarded Mr. Callaway's email to Mr. Johns and, in his email, questioned why it was "so hard to see we have not complied with the regulations" and why defendants continued to delay full compliance. Plaintiff urged Mr. Johns that it was "time to do the right thing."

That same week, plaintiff contacted Ms. Long by email to report his belief that defendants' Select Quote business was not compliant with state regulations because it was allowing non-appointed agents to submit business and did not list the soliciting agent on the application. He further stated that this issue was part of defendants' compliance department's "conspiracy to commit fraud." Ms. Long forwarded plaintiff's new concern to Mr. Callaway. Mr. Callaway contacted plaintiff that same day to advise him that his latest concern would be

investigated.  Plaintiff responded by questioning Mr. Callaway's objectivity and asked Mr. Callaway to recuse himself from the investigation.  Plaintiff also emailed Ms. Long and asked her why she would ask Steve Callaway to investigate the "fraudulent activity" when Mr. Callaway was responsible for that activity.  He suggested to Ms. Long that she appoint a "special team" to investigate the issues.

In response, Ms. Long, on December 12, 2007, assured plaintiff via email that his concerns were being taken seriously and handled appropriately.  She continued:

> Once an employee makes a complaint, the employee is expected to cooperate with the investigation by answering the questions asked by the individuals in charge of the investigation. The employee is not expected to conduct the investigation, to review or comment upon the course of the investigation, to draw conclusions about the investigation or to take similar action. This type of continuing involvement outside the scope of the employee's job duties can disrupt the investigation and the workplace.  Others in our organization are responsible for investigating the facts, drawing conclusions from the facts, and taking any appropriate action.

> We have repeatedly advised you that you should restrict yourself to answering questions and supplying the investigators with any new facts that come to your attention.  Despite the clear direction you have received, you have repeatedly stepped over the line and involved yourself in a way that has disrupted both the investigation and the performance of your co-workers.  In doing so, you have failed to respect the process and your co-workers who hare involved in the process.  I have asked the Human Resources Department to work with your manager to counsel you with respect to appropriate workplace behavior.

Plaintiff replied to Ms. Long by thanking her for her "advice" and then asking her whom he should contact with a complaint about the way in which she was conducting the investigation of his complaint.

The following day, plaintiff sent another email to Ms. Long and Mr. Johns concerning

defendants' continued failure to comply fully with state replacement regulations. That same day, December 13, 2007, Ms. Long instructed Wendy Evesque, a Human Resources representative, to work with Ms. Palmer in counseling plaintiff regarding the inappropriateness of his behavior. In her email to Ms. Evesque, Ms. Long explained that plaintiff "is free to make a complaint under the Code . . . but once he makes his complaint, he should refrain from sending emails to anyone else, including me, unless he has additional facts to report."

Consistent with Ms. Long's request, Ms. Palmer and Ms. Evesque issued plaintiff a written warning on January 3, 2008 based on his "pattern of disruptive and inappropriate conduct." The warning noted that defendants appreciated receiving plaintiff's initial report about defendants' compliance with various replacement regulations but that plaintiff's conduct since raising his initial complaint was disruptive. The warning advised plaintiff that he was expected to strictly limit his role from that point forward to responding to questions and providing facts to the appropriate personnel conducting the investigation. Plaintiff responded to the written warning with a written "rebuttal" in which he reiterated his position that defendants were not complying with applicable replacement regulations and reiterated his belief that he was being forced to "approve" noncompliant policies. He further expressly questioned Mr. Callaway's integrity and accused him of engaging in fraudulent conduct. Plaintiff also stated that it was "unacceptable" that defendants were not yet fully compliant with the regulations.

In addition to his written rebuttal, plaintiff also spoke privately with Ms. Evesque after he received his written warning. During this discussion, plaintiff reported for the first time that

11

he had heard from one employee that when West Coast Life changed computer systems in 2006, Ms. Palmer had commented to another employee that she was "worried about the men over the age of 50 being able to adjust to the new technology." Although he conceded that he had not heard Ms. Palmer make this comment or any other age-related comment, plaintiff complained to Ms. Evesque that he found the comment to be insulting and unlawful. Plaintiff would not disclose either the name of the employee who had shared the comment with him or the name of the employee to whom the comment was made. Ms. Evesque spoke with Ms. Palmer about the allegation and, shortly thereafter, closed her investigation because she found no evidence of age discrimination and because plaintiff did not contend that Ms. Palmer had ever discriminated against him in any way based on his age.

On January 7, 2008, plaintiff sent an email to Ms. Palmer requesting that she obtain an update from defendants' legal department regarding its review of the concerns he had raised about defendants' compliance with Nebraska's replacement regulations. Ms. Palmer shared this email with Ms. Evesque, Ms. Reed and legal counsel and it was decided that plaintiff should receive another written warning.[3] This written warning, dated January 15, 2008, again cautioned plaintiff that he had satisfied his duty when he identified a concern and reported it but that he was expected to stop initiating communications about issues that he had previously raised and to respect those individuals charged with investigating his concerns. In response, plaintiff sent a memorandum to Ms. Reed in which he disagreed that his conduct was disruptive or

---

[3]It is unclear from the record which individuals participated in the decision to issue the second written warning. It is clear, however, that Ms. Evesque, Ms. Palmer, Ms. Reed and a member of defendants' legal department reviewed the warning prior to plaintiff receiving it.

inappropriate, reiterated his belief that the company remained noncompliant with the replacement regulations and complained that defendants were not making his concerns a "high priority."

In early February 2008, plaintiff had a heated interaction with employee John Resudek, another senior underwriter in the office. While the parties vigorously dispute the nature and substance of the interaction, it is uncontroverted that Ms. Palmer ultimately had to mediate the matter in a closed-door meeting.[4] Several days after his interaction with plaintiff, Mr. Resudek sent an email to Ms. Palmer in which he stated that, during his interaction with plaintiff, plaintiff threatened him and "strongly suggested that we take it outside" numerous times during the interaction. Mr. Resudek stated that he believed that plaintiff's actions "were very intimidating" and that he was "afraid that even the slightest movement would prompt him to take violent action." Finally, Mr. Resudek stated that he had lost sleep due to the interaction with plaintiff and was "ill at ease" as to what plaintiff might do. Ms. Palmer forwarded Mr. Rusudek's email to Ms. Reed and Ms. Evesque.

The following day, February 12, 2008, Ms. Palmer called plaintiff into her office where another supervisor, Bob Marland, was present in person and Ms. Evesque was present via

---

[4]In their summary judgment submissions, defendants rely in part of the affidavit of Jennifer Dugger to support their version of the facts surrounding plaintiff's confrontation with Mr. Resudek. Plaintiff objects to the affidavit and to the use of Ms. Duggar as a witness at trial because defendants never disclosed Ms. Dugger as a possible witness. For summary judgment purposes, the argument is moot because the court has not relied on the affidavit and plaintiff survives the motion in any event. The court declines to address on this record whether Ms. Dugger may testify at trial and will resolve that issue after further briefing from or discussion with the parties.

telephone. Plaintiff was notified that the decision had been made to terminate his employment.

In a document memorializing the termination, Ms. Evesque wrote, in part, as follows:

> John Resudek reported to Lisa Palmer that he was intimidated and afraid of [plaintiff] based on the interaction and [plaintiff's] repeated suggest[ion] that they "take it outside."
>
> [Plaintiff] has been warned previously in two separate written warnings regarding his disruptive behavior.
>
> Because of this inappropriate behavior and the pattern of behavior, the decision was made to terminate [plaintiff's] employment.

Neither Ms. Evesque nor Ms. Palmer provided plaintiff an opportunity to respond to Mr. Resudek's allegations prior to the termination of his employment.

Additional facts will be related, as necessary, in connection with the court's analysis of defendants' motion and plaintiff's particular claims.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id.*

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III.     Retaliatory Discharge Claim

In the pretrial order, plaintiff asserts a Kansas common law retaliatory discharge claim. To prevail on such a claim, plaintiff must demonstrate that his discharge falls within one of the

exceptions to the employment-at-will doctrine. *Goodman v. Wesley Medical Center, LLC*, 276 Kan. 586, 589 (2003). One of those exceptions is termination for whistleblowing. *Id.* (citing *Palmer v. Brown*, 242 Kan. 893, 900 (1988)). In analyzing such claims, Kansas courts use a burden-shifting scheme whereby plaintiff is first required to present a prima facie case of retaliatory discharge. *Id.* at 590.

To establish a prima facie case for retaliatory discharge in the whistleblowing context, plaintiff must establish that a reasonably prudent person would have concluded that the employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and the employee was discharged for making the report. *Id.* at 589-90. Plaintiff must also establish that his whistleblowing was done in good faith based on a concern regarding the wrongful activity reported. *Id.* at 590. If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate nonretaliatory reason for terminating plaintiff's employment. *Id.* If defendant does so, the burden shifts back to plaintiff to present evidence tending to show that defendant's proffered reason for terminating plaintiff's employment is pretextual. *Id.* To survive a motion for summary judgment, plaintiff "must assert specific facts disputing the employer's motive for termination." *Id.*

Defendants move for summary judgment on the grounds that plaintiff cannot establish a prima facie case of retaliatory discharge because plaintiff lacks evidence of any causal connection between his reports and defendant's decision to terminate plaintiff's employment;

that plaintiff's reports were not made in "good faith" as required by Kansas law; and, in any event, plaintiff cannot establish that defendants' proffered reason for terminating plaintiff's employment is pretextual. As will be explained, the court concludes that plaintiff has presented evidence sufficient to establish the requisite causal connection for purposes of his prima facie case and has presented evidence of pretext sufficient to warrant a jury trial on his claim.

A.      *Causal Connection*

In support of its argument that plaintiff lacks evidence of any causal connection between his reports and the termination of his employment, defendants contend that no reasonable jury could find a causal connection between plaintiff's reports and the termination decision in light of defendants' overwhelming evidence that plaintiff's termination was based on his confrontation with Mr. Resudek. This evidence, however, is "the subject of the employer's proof and the plaintiff's response" and is not part of plaintiff's prima facie case. *Rebarchek v. Farmers Co-op. Elevator*, 272 Kan. 546, 557 (2001). The court, then, cannot consider this evidence in analyzing whether plaintiff has satisfied his prima facie burden–a burden that is not onerous. *Id*.

Defendants next contend that plaintiff cannot establish the requisite causal connection because the seven-month period between his initial July 2007 report and his February 2008 termination is too temporally remote to support an inference of causation. Of course, plaintiff does not suggest that his initial July 2007 complaint was the cause of his termination. He contends that defendant terminated his employment because he kept complaining in the face of

17

what he allegedly perceived as defendants' willful noncompliance with state replacement regulations. When the causation element is analyzed through this wider lens, the temporal proximity between plaintiff's protected activity and the decision to terminate plaintiff's employment is much closer and gives rise to the necessary inference of retaliatory motive.

Significantly, the record reflects that plaintiff again reported compliance concerns in response to his January 15, 2008 written warning. In his written memorandum to Ms. Reed, plaintiff reiterates that the "new NAIC states require companies under common ownership to allow credit for the period of time that has elapsed under the replaced policy." Plaintiff, in the memorandum, expresses frustration that the company has not made his concerns "a high priority" and disagrees with defendants' assessment that his "follow up" on his concerns regarding the Nebraska replacement regulations has been disruptive or inappropriate. A reasonable jury could conclude that plaintiff's memorandum contained another good faith report protected by Kansas law such that defendants' decision to terminate plaintiff's employment less than one month later is sufficient to give rise to an inference of causation. *E.E.O.C. v. PVNF, Inc.*, 487 F.3d 790, 800 (10th Cir. 2007) (temporal proximity of one month sufficient to establish a causal connection); *Annett v. University of Kansas*, 371 F.3d 1233, 1239-40 (10th Cir. 2004) (one-month gap between protected activity and adverse action sufficient to establish causation element of prima facie case); *White v. Tomasic*, 31 Kan. App. 2d 597, 603 (2003) (three-week gap sufficient to establish causation element in context of workers' compensation retaliation

claim).[5]

B.     *Good Faith*

Defendants also contend that plaintiff cannot establish a prima facie case of retaliatory discharge because no reasonable jury could conclude that plaintiff's complaints were made in good faith, particularly in light of the fact that plaintiff repeatedly raised the same concerns to multiple individuals and ignored the information provided to him by defendants' legal and compliance departments concerning the steps defendants had taken to ensure both that no policyholder or beneficiary had been harmed in the past and that defendants, in the future, would comply with the replacement regulations.  According to defendants, plaintiff's unfounded and insubordinate allegations of fraud and incompetency further underscore that plaintiff's complaints were not made in good faith.

On the record before it, the court simply cannot conclude that plaintiff, as a matter of law, was not acting in good faith.  Many of plaintiff's written communications about defendants' compliance with the replacement regulations reflect what could be viewed as a genuine concern that defendants might have denied a claim that should have been paid had defendants been following state regulations on replacement policies.  Moreover, there is evidence that defendants experienced some delay in correcting the deficiencies reported by plaintiff such that a reasonable

---

[5]Because the Kansas Supreme Court has expressly looked to Tenth Circuit decisions for guidance concerning the acceptable period of time between a plaintiff's protected activity and an adverse action, the court is comfortable doing so here. *See Rebarchek v. Farmers Cooperative Elevator*, 272 Kan. 546, 554-55 (2001).

19

jury could conclude that plaintiff's admittedly aggressive follow up was nonetheless conducted out of a good faith concern for protecting the rights of policyholders and beneficiaries. In a related vein, viewing the evidence in the light most favorable to plaintiff, the nature of plaintiff's job as an underwriter required him to "approve" policies on a daily basis such that he had a good faith reason to raise his concerns on an ongoing basis until the compliance issue was corrected. For these reasons, a jury is required to evaluate whether plaintiff raised his concerns in good faith.[6]

## C. Pretext

Because plaintiff has established his prima facie case, defendants must articulate a legitimate, nonretaliatory reason for terminating plaintiff's employment. *Goodman v. Wesley Medical Center, LLC*, 276 Kan. 586, 590 (2003). In their submissions, defendants urge that they terminated plaintiff's employment based solely on his confrontation with Mr. Resudek. Defendants have satisfied their burden of production and the burden shifts back to plaintiff to demonstrate a genuine dispute of material fact as to whether defendants' stated reasons are unworthy of belief. *Id.*

---

[6]The court also notes that the *Palmer* decision requires that an employee make a report in good faith "rather than from a corrupt motive such as malice, spite, jealousy or personal gain." 242 Kan. at 900. Although defendants contend that plaintiff was not motivated by good faith, they have offered no evidence supporting any other motive plaintiff might have had for raising his concerns. Although defendants are not required to come forward with evidence of an alternative motive, the lack of evidence concerning such motive further underscores the court's unwillingness to conclude as a matter of law that plaintiff was not acting in good faith.

To be sure, plaintiff has come forward with specific facts establishing a triable issue as to whether the confrontation with Mr. Resudek was the real reason for the termination of plaintiff's employment. As an initial matter, Ms. Evesque's written memorandum concerning the termination specifically references plaintiff's "disruptive behavior" as detailed in his prior written warnings and notes that the termination is based not only on the confrontation with Mr. Resudek but also on the "pattern of behavior" described in the written warnings. Quite simply, then, this memorandum tends to suggest that defendants' statement that the termination decision was based solely on plaintiff's confrontation with Mr. Resudek is unworthy of belief.

Moreover, plaintiff's pretext evidence includes an e-mail communication from Ms. Reed to Ms. Evesque on the morning of February 12, 2008–the date of plaintiff's termination. In that communication, Ms. Reed expresses her belief (based on Mr. Resudek's e-mail to Ms. Palmer that she shared with Ms. Reed and Ms. Evesque) that part of the substance of the interaction between plaintiff and Mr. Resudek concerned plaintiff's efforts to cure what he perceived as defendants' noncompliance with state replacement regulations. In pertinent part, Ms. Reed wrote:

> [Plaintiff] is on warning. He violated that warning that asked him not to be disruptive. I am not talking about the confrontation . . . but rather the fact that he continued to . . . discuss his warning and the replacements with others. . . . The warning is worded in such a way that discussing this with [Mr. Resudek] is inappropriate. It continues to undermine the office. This office would be so much better off without [plaintiff's] constant interference . . . .
>
> If [plaintiff] spent as much time on his work as he does finding ways to make himself feel important we would be better off. Please consider a termination."

This email, then, strongly supports plaintiff's argument that his termination was not based on his

confrontation with Mr. Resudek but was based on plaintiff's conduct as described in his disciplinary warnings.

Finally, plaintiff highlights that defendants' position in their summary judgment submissions that plaintiff was terminated solely on the basis of his confrontation with Mr. Resudek is inconsistent with defendants' earlier responses to plaintiff's interrogatories, in which defendants identified the reasons for plaintiff's termination as follows:

> "[W]ithin a less than two month time period, Plaintiff had received two written warnings regarding inappropriate and disruptive behavior and had physically threatened a co-worker."

Defendants' shifting of explanations simply adds another layer of support to plaintiff's pretext argument. *See Randle v. City of Aurora*, 69 F.3d 441, 455 (10th Cir.1995) ("shifting of explanations" offered by defendant with respect to rationale underlying employment decision strengthened plaintiff's pretext argument).

In response to plaintiff's pretext evidence, defendants contend that he nonetheless cannot survive summary judgment because even if a jury believed that defendants terminated plaintiff's employment based on the conduct described in the written warnings, that termination would not violate Kansas law.[7] According to defendants, those warnings reflect, at most, that plaintiff was

---

[7]To the extent defendants also suggest that plaintiff cannot show pretext because there is "no evidence of a similarly situated employee who threatened and intimidated a fellow co-worker who was not terminated," that argument lacks merit. *Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1137 (10th Cir. 2003) (district court erred in ruling that a plaintiff must show she was treated differently from other similarly situated employees to survive summary judgment; a plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual).

not terminated for his initial report of a compliance concern–a report for which defendants repeatedly thanked plaintiff–but for his "post report" activities such as unnecessarily reasserting the same concern to numerous individuals; requesting ongoing updates regarding the concern from individuals involved in the investigation; making unsupported allegations of fraud; and repeatedly refusing to respect both the investigation process and the roles of those involved in the company's compliance efforts. According to defendants, these activities fall well outside the scope of the whistleblower protections afforded by Kansas law.

Defendants direct the court to no authority supporting their suggestion that Kansas law entitles plaintiff to one reporting of one concern and any reports thereafter provide fodder for disciplinary action. While defendant does highlight several cases that they contend stand for the proposition that "excessive complaints or inappropriate behavior while engaged in protected activity can be so inimical to the employer's interests as to be beyond the protection of non-retaliatory provisions," none of those cases involves an application of that principle in the summary judgment context and, thus, are not persuasive to the court here. *See Trimmer .v U.S. Dept. of Labor*, 174 F.3d 1098 (10th Cir. 1999) (appealing decision of the Administrative Review Board of the Department of Labor adopting factual findings of ALJ); *Kahn v. U.S. Secretary of Labor*, 64 F.3d 271, 279 (7th Cir. 1995) (appeal from ALJ's factual findings); *Sullair P.T.O., Inc. v. NLRB*, 641 F.2d 500 (7th Cir. 1981) (appeal from ALJ's factual findings and Board's order affirming those findings); *NLRB v. Truck Drivers, Oil Drivers, Filling Station & Platform Workers Union, Local 705*, 630 F.2d 505 (7th Cir. 1980) (same); *.Hochstadt v. Worchester Foundation for Experimental Biology*, 545 F.2d 222 (1st Cir. 1976) (appeal from

district court's factual findings after hearing on application for preliminary injunction); *Ammons v. Zia Co.*, 448 F.3d 117 (10th Cir. 1971) (appeal from district court's factual findings after bench trial).

Viewing the evidence here in the light most favorable to plaintiff, the court cannot conclude as a matter of law that defendants did not terminate plaintiff's employment in violation of Kansas law. Plaintiff's evidence reflects that he reported good faith concerns–some new, some not–until just prior to his termination in February 2008. Those reports are inextricably intertwined with conduct that defendants contend is insubordinate and inappropriate. Indeed, the record is replete with email communications from plaintiff arguably containing both protected and unprotected activity. In such circumstances, a jury must decide what motivated defendants to terminate plaintiff's employment.

## IV.    ADEA Retaliation Claims

In the pretrial order, plaintiff also asserts a claim for retaliation under the Age Discrimination in Employment Act (ADEA). Specifically, plaintiff contends that he received his January 15, 2008 written warning and was subsequently terminated in retaliation for his January 3, 2008 report to Ms. Evesque that his supervisor, Ms. Palmer, had made an age-related comment. In their motion for summary judgment on this claim, defendants contend first that the court must grant summary judgment in favor of defendants because plaintiff, in light of his Kansas whistleblower claim, cannot establish that his ADEA-related protected activity was the "but for" cause of his discipline or termination as required by the Supreme Court's decision in

24

*Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343 (2009). In the alternative, defendants contends that summary judgment is nonetheless appropriate because plaintiff cannot establish the causation element of his prima facie case and cannot establish that defendants' proffered reasons for disciplining and terminating plaintiff are pretextual.

As will be explained, the court rejects defendants' interpretation of the *Gross* decision and further concludes that plaintiff has come forward with sufficient evidence from which a jury could reasonably conclude that defendants disciplined and discharged plaintiff because of his age-related complaint.

A.      *The Supreme Court's Opinion in* Gross

As a threshold matter, defendants maintain that summary judgment is warranted on plaintiff's ADEA claims based on the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343 (2009). In *Gross*, the Supreme Court reviewed an ADEA jury instruction that required a verdict for the plaintiff if he proved by a preponderance of the evidence that he was demoted and that his age was a "motivating factor" in the demotion decision. *Id.* at 2347. The jury was also instructed that the plaintiff's age was a motivating factor if it "played a part" in the demotion decision. *Id.* The Supreme Court held that the instruction was not proper because the ADEA does not authorize a mixed-motives age discrimination claim. *Id.* at 2350. Rather, a plaintiff must prove that age was the "but-for" cause

of the employer's adverse decision.  *Id.*[8]

According to defendants, the *Gross* decision precludes an ADEA plaintiff from proceeding to trial with alternative theories for an employer's adverse actions.  With respect to this case, defendants contend that plaintiff's vigorous accusations that his discipline and discharge were based on his whistleblowing activity under Kansas law precludes plaintiff from also asserting that his ADEA-related complaint was the "but for" cause of his discipline and discharge.  Indeed, defendants direct the court to two district court cases supporting their argument.  *Culver v. Birmingham Board of Ed.*, 646 F. Supp. 2d 1272 (N.D. Ala. 2009) (plaintiff's complaint alleged race and age as reasons underlying adverse action; prior to the dispositive motion deadline, court entered order in light of *Gross* requiring plaintiff to either abandon his age claim or abandon his race claim); *Wardlaw v. City of Philadelphia Streets Dept.*, 2009 WL 2461890, at *4 (E.D. Pa. Aug. 11, 2009) (granting summary judgment on ADEA claim based on *Gross* where plaintiff also asserted that adverse actions were based on gender, race and disability).

The majority of cases, however, have disagreed with this bright-line approach and have continued to simply apply the *McDonnell Douglas* framework at the summary judgment stage while also recognizing that at trial the plaintiff bears the burden of persuasion to prove that age

---

[8]The Supreme Court's decision in *Gross* addressed a discrimination claim under 29 U.S.C. § 623(a) and hinges on the Court's interpretation of the phrase "because of" found in that section.  Plaintiff's claims here, of course, are based not on the anti-discrimination provision of the ADEA but on the anti-retaliation provision of the ADEA, 29 U.S.C. § 623(d).  Neither party discusses this distinction and because that section contains language akin to the "because of" language in § 623(a), the court assumes that the *Gross* decision applies with full force to ADEA retaliation claims.

discrimination was the but for cause of the adverse employment action. *See Frankel v. Peake*, 2009 WL 3417448, at *4 (D.N.J. Oct. 20, 2009) (citing *Ferruggia v. Sharp Elect. Corp.*, 2009 WL 2634925, at *3 (D.N.J. Aug. 25, 2009) (collecting cases)); *Barkhoff v. Bossard North Am., Inc.*, ___ F. Supp. 2d ___, 2010 WL 331784 (N.D. Iowa Jan. 28, 2010) (after *Gross*, permitting both age and race claims to proceed to trial.

Moreover, the Tenth Circuit, in the wake of *Gross*, albeit in an unpublished decision, has continued to adhere to the familiar *McDonnell Douglas* framework in analyzing a summary judgment motion in the ADEA context. *See Woods v. Boeing Co.*, 2009 WL 4609678, at *2-3 (10th Cir. Dec. 8, 2009). In his concurring opinion, Judge Anderson noted that, for purposes of summary judgment, the plaintiff "properly attempts to resist summary judgment by arguing that [defendant's] proffered reasons for not hiring him are unworthy of belief." *Id.* at *6. He emphasized, however, that the "but for" burden of proof would rest directly on plaintiff in a jury trial "and the jury [must] be instructed accordingly." *Id.* At this point in the Tenth Circuit's jurisprudence, then, it appears that *Gross* has very little affect on the summary judgment analysis. For these reasons, the court rejects defendants' contention that plaintiff is precluded as a matter of law from pursuing his ADEA claims simply because he has also asserted a state law whistleblower claim.[9]

---

[9]It is possible, for example, that a jury in this case could determine that defendants did not discharge plaintiff for his state law whistleblower activities but that plaintiff's decision to report Ms. Palmer's alleged age-related comment–a comment that she allegedly made two years prior to plaintiff's report and had no bearing on his employment status–was the proverbial straw that broke the camel's back.

*B.      Prima Facie Case*

To establish a prima facie claim under the ADEA for retaliation, a plaintiff must establish three elements: (1) he or she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action. *Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1202 (10th Cir.2008) (citation omitted). Defendants challenge only the third element of plaintiff's prima facie case. However, the close temporal proximity between plaintiff's January 3, 2008 complaint about Ms. Palmer's alleged age-related comment and both his written warning just 12 days later and his termination less than 6 weeks later is sufficient, standing alone, to establish the requisite causal connection for purposes of plaintiff's prima facie case. *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (temporal proximity of two weeks between termination and protected activity is alone sufficient to establish causal connection for purposes of prima facie case of retaliation); *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1171-72 (10th Cir. 2006) (where termination occurred at most 6 weeks after defendant knew plaintiff intended to engage in protected activity, termination was "very closely connected in time" to protected activity and plaintiff established third element of prima facie case).

*C.      Pretext*

Because plaintiff has established a prima facie case with respect to his retaliatory discipline and retaliatory discharge claims under the ADEA, defendants have the burden to

produce a legitimate, nonretaliatory reason for plaintiff's discipline and discharge. *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005). According to defendants, plaintiff was given the January 15, 2008 written warning because he continued to second-guess management in violation of his first written warning concerning his disruptive and inappropriate conduct as evidenced by his January 7, 2008 email to Ms. Palmer inquiring about the status of his report concerning defendants' compliance with certain Nebraska replacement regulations. With respect to plaintiff's discharge, defendants, as explained above in connection with plaintiff's state law claim, contend that plaintiff's employment was terminated based solely on his confrontation with Mr. Resudek. Defendants have satisfied their burden.

The only question left, then, is whether plaintiff has sufficiently established that defendants' proffered reasons are a pretext for unlawful retaliation. *See id.* Pretext exists "when an employer does not honestly represent its reasons for terminating an employee." *Id.* Thus, the court's inquiry at this stage turns on whether plaintiff has come forward with sufficient evidence from which a reasonable jury could conclude that defendants' proffered reasons are unworthy of belief. *See id.* In assessing plaintiff's pretext evidence, the court is mindful that, despite the close proximity in time between plaintiff's complaint about Ms. Palmer's alleged age-related comment and both his January 15, 2008 warning and his discharge, temporal proximity alone is not sufficient to defeat summary judgment. *Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1066 (10th Cir. 2009).

In support of his pretext argument concerning his second written warning, plaintiff focuses on defendants' efforts to persuade the court that Ms. Palmer–the only person with a

motive to retaliate against plaintiff for his ADEA-related complaint–was not involved in the decision to issue the January 15, 2008 warning. According to plaintiff, the fact that defendants are attempting to "distort" the record on this material issue and artificially distance Ms. Palmer from the written warning is evidence, in and of itself, of pretext. To begin, the record is devoid of any evidence concerning who actually drafted the warning. The record is also vague as to who participated in the decision to give plaintiff the warning. Ms. Palmer testified that she did not know who drafted the warning but that she received it from Ms. Evesque in an email with instructions to deliver it to plaintiff. Ms. Evesque, in turn, testified that she and Ms. Palmer reviewed the warning and that Ms. Reed and in-house counsel had also reviewed the warning prior to plaintiff receiving it.

In the absence of any affirmative evidence concerning the drafter of the warning, the court turns to the warning itself–a warning that clearly stemmed from Ms. Palmer's decision to forward plaintiff's January 7, 2008 e-mail (in which he requested that Ms. Palmer obtain an update on the concerns he had raised about defendants' compliance with Nebraska's replacement regulations) to Ms. Evesque, Ms. Reed and in-house counsel. The warning is written in the first-person voice of Ms. Palmer and is signed and dated by Ms. Palmer. At a minimum, then, there is a factual issue concerning whether Ms. Palmer participated in the decision to give plaintiff the second written warning. In such circumstances, the court believes that a reasonable jury could conclude that defendants' unwillingness to identify Ms. Palmer as a participant in the decisionmaking process suggests that they recognize that Ms. Palmer may have been influenced by plaintiff's complaint–just days earlier–that she had made an unlawful age-related comment

in the workplace. *See Miller*, 396 F.3d at 1111 (in connection with pretext analysis, referencing "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt") (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 147 (2000)).

Moreover, in the written warning's first-person narrative concerning the impropriety of plaintiff's January 7, 2008 email to Ms. Palmer, Ms. Palmer states that she is "counseling [plaintiff] not [to] send further e-mails of this nature to me or to others since, as you have previously been advised, this type of e-mail is an unnecessary distraction for you and disruptive to the recipients of the e-mails." Ms. Palmer readily admitted in her deposition, however, that the January 7, 2008 e-mail was not disruptive to her. This evidence further casts some doubt on defendants' proffered reason for issuing plaintiff the second written warning. The court, then, denies defendants' summary judgment motion with respect to this claim.

Because plaintiff has shown that his January 15, 2008 warning may have been tainted by retaliatory animus and the evidence viewed in the light most favorable to plaintiff reflects that his discharge was based at least in part on that warning, plaintiff's discharge is similarly suspect. Moreover, it is uncontroverted that Ms. Palmer's forwarding Mr. Resudek's email to Ms. Evesque and Ms. Reed served as the catalyst for the termination decision–a decision made in part by Ms. Palmer. For these reasons, whether Ms. Palmer's actions were influenced by plaintiff's allegation that she had made discriminatory comments is a jury question.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment (doc. 34) is denied.

**IT IS SO ORDERED.**

Dated this 4th day of March, 2010, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge